1

2

3

4

5                    **UNITED STATES DISTRICT COURT**
                          **DISTRICT OF NEVADA**
6                            **RENO, NEVADA**

7
MARY LAHREN, an individual;      )      3:03-CV-0631-ECR-VPC
8 RICHARD SCHWEICKERT, an          )
individual; ANN DOUGHERTY,       )
9 an individual;                   )
                                 )
10                                  )      **ORDER**
Plaintiffs,                      )
11                                  )
vs.                              )
12                                  )
UNIVERSITY AND COMMUNITY         )
13 COLLEGE SYSTEM OF NEVADA, a      )
political subdivision of         )
14 the State of Nevada;             )
ROBERT KARLIN, an individual;    )
15 JOHN LILLEY, an individual;      )
JANE LONG, an individual;        )
16 JOHN FREDERICK,                  )
an individual; JAMES             )
17 TARANIK, an individual           )
                                 )
18 Defendant.                       )
_____)
19

20

21 **I.  Procedural Background**

22      On August 30, 2004, Plaintiff Ann Doughtery ("Plaintiff" or

23 "Dougherty") filed a complaint (#43) against Defendants University

24 and Community System of Nevada, Robert Karlin, John Lilley, Jane

25 Long, John Frederick, and James Taranik ("Defendant", "Defendants",

26 "UCCSN", "Karlin", "Lilley", "Long", "Frederick" and "Taranik")

27 alleging Title VII retaliation, violation of her right to free

28 speech under 42 U.S.C. §1983, and defamation under the Due Process

Clause of the Fourteenth Amendment and Nevada state law.   On September 24, 2004, Defendants filed a counterclaim (#34) against Plaintiff alleging breach of contract, fraud and unjust enrichment. On April 18, 2005, Plaintiff filed a Motion (#48) for Summary Judgment on Defendant's Counterclaim. On May 4, 2005, Defendants filed an Opposition to Plaintiff's Motion for Summary Judgment and a Counter-Motion for Summary Judgment (#54), and Plaintiff opposed the motion (#70) and filed a response (#69) on August 22, 2005. Defendant filed a reply (#87) on September 12, 2005.

The motions are ripe and we will now rule on them.

## II.   Statement of Facts

Plaintiff is an attorney and member of the Washington State Bar who was hired by Defendant UCCSN as the Director of Affirmative Action at the University of Nevada, Reno ("the University") in 1995.

Plaintiff received a complaint of sexual harassment from Dr. Mary Lahren and investigated these charges, issuing a report concerning her investigation in which she found that Dr. Lahren's charges of sexual harassment had merit.  The report was issued only to President Lilley and was not disclosed to the public, Dr. Lahren or the mediation committee.

On June 26, 2002, the University issued Plaintiff a "Notice of Non-Reappointment" terminating Plaintiff's employment, pursuant to the UCCSN Code, on June 30, 2003.[1]  On July 22, 2002, Plaintiff

---

[1]The UCCSN Code required a 365 day notice for termination.  UCCSN Code § 5.9.

requested reasons for her non-reappointment and additional
information relating to her job performance.  President Lilley
responded to Plaintiff's request as follows:

> You have been issued a notice of non-reappointment as
> the result of my loss of confidence in you, based on the
> following:
>
>   1.   failure to promote a service-oriented approach
>        in the Affirmative Action Office;
>
>   2.   ineffective sexual harassment workshops;
>
>   3.   inconsistent application of search documentation
>        procedures;
>
>   4.   lack of cooperation with administration and
>        academic rules;
>
>   5.   incomplete investigations, incomplete reporting
>        of investigations, failure to maintain
>        objectivity in investigations, and drawing
>        conclusions with insufficient evidence;
>
>   6.   inappropriate denial of release of information
>        to administration; and
>
>   7.   poor relationship with the campus and complaints
>        about, among other points, biased investigations
>        and search delays.

After having been given the reasons for her nonreappointment,
Plaintiff requested reconsideration.  Such reconsideration was
granted but the decision by President Lilley did not change after
reconsideration.

On July 26, 2002, President Lilley reassigned Plaintiff from
her position as the Director of Affirmative Action to Special
Assistant to the Vice Provost.  Her compensation and benefits did
not change, although Plaintiff was given different assignments and
was told that she was free to search for other employment beginning
in July 2003 elsewhere.

3

On January 7, 2003, Plaintiff's request to be placed on leave was granted. On January 24, 2003, Plaintiff emailed Vice Provost Ort asking to be placed on annual leave effective February 3, 2002. Vice Provost Ort approved this leave. On March 14, 2003, Plaintiff had exhausted all of her annual leave. On March 31, 2003, when Plaintiff still had not returned to work, President Lilley wrote Plaintiff informing her that she had exhausted her annual leave and requesting that she inform the University of her intentions. Plaintiff did not respond to President Lilley's request.

On May 12, 2003, at Vice Provost Ort's request, Plaintiff met with her to discuss Plaintiff's employment status. At this time, Plaintiff claimed that she was searching for employment without much success. On May 22, 2003, Vice Provost Ort sent Plaintiff a memorandum summarizing the meeting. Ms. Ort requested that Plaintiff read the memo in detail and respond as soon as possible. Although Plaintiff claims she read the memo, she did not respond.

Without informing the University, Plaintiff had applied for a job with Washington State University on April 18, 2002, several months before she obtained the Notice of Nonreappointment from the University. Plaintiff interviewed for the position on September 22, 2002, and officially accepted the position at Washington State University in December 2002. Plaintiff relocated to Washington state in January 2003 and began working for Washington State University full-time on January 13, 2003.

Plaintiff had not informed the University at any point that she was dually employed full-time at another University in another state. Even at her meeting with Vice Provost Ort, when asked

4

whether she was pursuing employment opportunities and applying to other jobs, Plaintiff did not disclose her dual employment status.

Plaintiff contested the timeliness of the Notice of Non-Reappointment that had been mailed to her on June 26, 2002. For this reason, the University reissued an additional Notice of Non-Reappointment to Plaintiff on June 9, 2003, informing her that her employment with the University would end June 30, 2004. The reasons given in the second Notice of Non-Reappointment were the same as the first.

Despite the fact that she had used all her annual leave for the year and had been requested by the University to explain her absence, Plaintiff continued to be a no-show at her job.

The University continued to pay Plaintiff as was required under her employment contract and the UCCSN Code. When it became clear that Plaintiff would not return to work, the University instituted termination procedures against Plaintiff based on her failure to return to work.

On June 19, 2003, Dr. Laden wrote to Plaintiff and informed her that Dr. Laden had been appointed as Administrative Officer to conduct her termination proceedings under the Code's disciplinary procedures. Dr. Laden informed Plaintiff she was being terminated for having violated Section 6.2.1 for unauthorized absence from duty or absence of leave privileges because Plaintiff had exhausted her annual leave on March 14, 2003, and had continued to be absent from her employment without submitting any medical leave forms. Plaintiff contacted Dr. Laden and informed her that Plaintiff had asked her medical provider to send a letter after the May 12

5

meeting with Vice Provost Ort.  In addition, Plaintiff complained to Dr. Laden that it was hard to be on campus without meaningful work and that she believed the termination proceedings being conducted by Dr. Laden were being instituted in retaliation for the complaint that she filed with the Nevada Equal Rights Commission (NERC) and the Equal Employment Opportunity Commission (EEOC).

On July 14, 2003, Vice Provost Ort contacted Plaintiff informing her that the University had yet to receive a complaint filed by Plaintiff with NERC or the EEOC.  Vice Provost Ort also informed Plaintiff that a letter had been received from Plaintiff's medical provider and that the letter did not provide any reason to excuse Plaintiff from performing her job in the past or in the future.

Plaintiff was contacted by Dr. Laden on July 26, 2003, to try and set up a convenient time to get together and discuss peremptory challenges of committee members for the termination proceedings. Plaintiff told Dr. Laden that she did not think it fair to institute proceedings while she had an active EEOC complaint.

Vice Provost Ort received Plaintiff's EEOC complaint on July 21, 2003.

On July 30, 2003, after several attempts by Dr. Laden to contact Plaintiff and get together with her to discuss the termination proceedings, Plaintiff emailed Dr. Laden stating that she not longer wished to participate in the termination proceedings and that she considered her employment with the University terminated.  When Dr. Laden replied to her email asking whether

this should be considered her letter of resignation, Plaintiff did not respond.

As of August 1, 2003, Plaintiff had been working for WSU for approximately seven (7) months. During that period, her paychecks were being deposited by the University directly into her checking account. Plaintiff never informed the University, even after Plaintiff notified Dr. Laden that she considered her employment terminated, that the University no longer had an obligation to deposit funds into her account.

On August 12, 2003, Plaintiff was informed by Dr. Laden that her termination hearing was scheduled for September 5, 2003. Plaintiff did not respond.

On September 5, 2003, Dr. Laden recounted to Plaintiff in a letter the result of the termination hearing against Plaintiff. The committee had ruled that Plaintiff had violated her contractual obligations by being absent from duty for longer than authorized without a viable excuse. She was ordered to pay restitution to the University in the amount of $41,402.94. She was terminated as of August 31, 2003. The termination determination was then sent to President Lilley under the UCCSN Code. The President has final determination of whether to terminate employees after the employee has gone through the termination proceedings.

On September 15, 2003, President Lilley wrote to Plaintiff informing her that he agreed with the committee's determination, that she had misrepresented her employment status, and that she did so in order to continue to receive paychecks from the University despite her refusal to work and her employment at Washington State

1  University.  President Lilley terminated her employment on

2  September 15, 2003, and ordered her to pay restitution.

3      On October 19, 2003, Plaintiff wrote President Lilley

4  enclosing a check made for $10,458.33.  She informed President

5  Lilley that the sum represented the amount erroneously paid to her

6  during the previous year.  She wrote that payment meant that she

7  would consider the matter closed.

8      On November 21, 2003, President Lilley wrote Plaintiff

9  informing her that, although he did not agree with her position,

10  the University would be willing to accept her payment of $10,458.33

11  for resolution of the matter in exchange for her signature on a

12  mutual release of all claims.

13      On November 20, 2003, Plaintiff wrote President Lilley asking

14  him to deposit the check earlier than December 1, 2003, because her

15  accounts would close after that time.[2]  She did not enclose the

16  release.

17      President Lilley then sent her a letter in response, returning

18  the check she had previously sent him, and requesting that she

19  issue a new check as well as sign the release of all claims.

20

21  **II.  Discussion**

22

23  **A.  Summary Judgment Standard**

24      Summary judgment allows courts to avoid unnecessary

25  trials where no material factual dispute exists.  <u>Northwest</u>

26      [2]Plaintiff's account was actually closed on December 9, 2003,
   even though she informed President Lilley that it would be closed on
27  December 1, 2003.

28                                    8

Motorcycle Ass'n v. U.S. Department of Agriculture, 18 F.3d 1468, 1471 (9th Cir. 1994). The court must view the evidence and the inferences arising therefrom in the light most favorable to the nonmoving party, Bagdadi v. Nazar, 84 F.3d 1194, 1197 (9th Cir. 1996), and should award summary judgment where no genuine issues of material fact remain in dispute and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). Judgment as a matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party. Fed. R. Civ. P. 50(a). Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted. Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct. 1261 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the parties may submit evidence in an inadmissible form-- namely, depositions, admissions, interrogatory answers, and affidavits--only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment. Fed. R. Civ. P. 56©; Beyene v. Coleman Security Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

9

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof. Anderson, 477 U.S. at 248. Summary Judgement is not proper if material factual issues exist for trial. B.C. v. Plumas Unified Sch. Dist., 192 F.3d 1260, 1264 (9th Cir. 1999). "As to materiality, only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248. Disputes over irrelevant or unnecessary facts should not be considered. Id. Where there is a complete failure of proof on an essential element of the nonmoving party's case, all other facts become immaterial, and the moving party is entitled to judgment as a matter of law. Celotex, 477 U.S. at 323. Summary judgment is not a disfavored procedural shortcut, but rather an integral part of the federal rules as a whole. Id.

**B.  Title VII Claim**

Plaintiff's first claim is that Defendants retaliated against her for aiding in the sexual harassment proceedings instituted by Dr. Mary Lahren in 2001. Plaintiff claims that she was issued a Notice of Non-Reappointment "at least in part by her issuance of the report and a finding which was adverse to the position of the Defendant vis-a-vis Dr. Lahren."

1    In order to prevail on an action for retaliation under Title
2  VII, Plaintiff must make out a prima facie case of retaliation
3  establishing (1) she undertook a protected activity, (2) her
4  employer subjected her to an adverse employment action; and (3)
5  there is a causal link between those two events.  Okwuosa v.
6  Employment Dev. Dep't (EDD), 2005 U.S. App. LEXIS 15006, at *9 (9th
7  Cir. 2005).

8    Title VII prohibits "discrimination for making charges,
9  testifying, assisting, or participating in enforcement
10 proceedings."  42 U.S.C. 2000e-3.  Title VII, as interpreted by the
11 courts, prohibits two forms of retaliation: opposition and
12 participation.  Opposition retaliation occurs when an employee
13 suffers an adverse employment action because the employee opposes a
14 practice of the employer that is unlawful under Title VII. Soto v.
15 John Morrell & Co., 285 F. Supp. 2d 1146, 1175 (N.D. Iowa 2003).
16 Participation retaliation occurs when an individual is treated
17 adversely for making a charge, testifying, assisting or
18 participating in any manner in an investigation, proceeding or
19 hearing under Title VII.  Coleman v. Wayne State Univ., 664 F.
20 Supp. 1082, 1087 (E.D. Mich. 1987).  Here, Plaintiff complains of
21 participation retaliation because she was involved in the sexual
22 harassment claim of Lahren.  See Clark v. Alabama, 2005 U.S. App.
23 LEXIS 10276, at *17 (6th Cir. 2005)(holding that plaintiff
24 established a prima facie case of retaliation by demonstrating a
25 causal connection between her testifying on behalf of another
26 employee and her termination); Miceli v. United States DOT, 83 Fed.
27 Appx. 697, 700 (6th Cir. 2003)(holding that testifying and
28

11

1  participating in a co-worker's case for sexual harassment was
2  protected activity).

3      Plaintiff has demonstrated that she undertook a protected
4  activity (participation in the Lahren sexual harassment claim) and
5  that she was subject to adverse employment action in obtaining a
6  Notice of Non-Reappointment.

7      The Ninth Circuit has recently noted that: "It is important to
8  emphasize that it is causation, not temporal proximity itself that
9  is an element of plaintiff's prima facie case, and temporal
10 proximity merely provides an evidentiary basis from which an
11 inference can be drawn." Kachmar v. SunGard Data Sys., 109 F.3d
12 173, 178 (9th Cir. 1997).  Here, Plaintiff has demonstrated that
13 there was temporal proximity of six weeks between the issuance of
14 the report on Dr. Lahren and the adverse action of nonreappointment
15 and demotion.  Therefore, Plaintiff established a prima facie case
16 of retaliation.

17     If Plaintiff provides sufficient evidence to show a prima
18 facie case of retaliation, the burden then shifts to Defendants to
19 articulate a legitimate non-retaliatory reason for its actions.
20 Ray v. Henderson, 217 F.3d 1234, 1240 (9th Cir. 2000).

21     Here, Defendants offer the reasons of inadequate performance
22 by Plaintiff as set forth by President Lilley in his Notice of Non-
23 Reappointment.  Defendants' reasons are legitimate and non-
24 retaliatory, supported by evidence that President Lilley was
25 dissatisfied with the sexual harassment programs and the way in
26 which Plaintiff had conducted the entire Affirmative Action
27 Program.  Defendants argue that it was the way Plaintiff *conducted*
28

the Lahren investigation and not the content of the report that she
issued that was the source of the University's dissatisfaction.

Since the Defendants have met their burden and have presented
legitimate, non-retaliatory reasons for the Notice of
Nonreappointment, the burden of production shifts back to Plaintiff
to show that the proffered reasons are pretextual.  <u>Steiner v.
Showboat Operating Co.</u>, 25 F.3d 1459, 1464 (9th Cir. 1994).  To
avoid summary judgment, Plaintiff must offer "specific and
significantly probative" evidence that the employer's explanation
for its action is a pretext for discrimination.  <u>Schuler v.
Chronicle Broadcasting Co., Inc.</u>, 793 F.2d 1010, 1011 (9th Cir.
1986).

Plaintiff has demonstrated that there is an issue of material
fact as to whether Defendants' reasons are indeed legitimate and
non-discriminatory.  In particular, Plaintiff points to the fact
that Defendants admit that the Lahren investigation was indeed a
factor in Plaintiff's termination.

Defendant's motion for summary judgment as to Plaintiff's
claim of Title VII retaliation will be denied.

**C.  First Amendment Retaliation**

Plaintiff claims that she was discharged because of her
adverse report in the Lahren case and that this constituted a
violation of her constitutional right to free speech under the
First Amendment.  Plaintiff claims that she was retaliated against

13

1  for exercising her right to free speech and that Defendants are

2  liable under 42 U.S.C. § 1983 for having discharged her.[3]

3       As the Supreme Court has recently held, a government employee

4  does not "relinquish all First Amendment rights otherwise enjoyed

5  by citizens just by reason of his or her employment." <u>City of San</u>

6  <u>Diego, Cal. v. Roe</u>, 543 U.S. 77, 524 (2004)(citing <u>Keyishian v.</u>

7  <u>Board of Regents of Univ. of State of N.Y.</u>, 385 U.S. 589 (1967)).

8  However, governmental employers do retain the right to impose

9  certain restrictions on their employees–such restraints that might

10 be unconstitutional if applied to the public.  <u>Id</u>  There are two

11 lines of cases that have emerged when government employers have

12 created policies restricting the speech of employees.  Employees

13 have been given the right to speak on matters of public concern as

14 they are uniquely qualified to discuss such topics.  <u>Connick v.</u>

15 <u>Myers</u>, 461 U.S. 138 (1983); <u>Pickering v. Board of Educ. of Township</u>

16 <u>High School Dist. 205, Will Cty.</u>, 391 U.S. 563 (1968).  Second,

17 employees are given First Amendment protection for speaking or

18 writing on their own time on topics unrelated to their employment.

19 <u>United States v. Treasury Employees</u>, 513 U.S. 454, 465 (1995).

20      Thus, to establish a prima facie case of First Amendment

21 retaliation, a government employee must establish that (1) she

22

23      [3]Defendants first argue that Plaintiff cannot bring this action
24 under Section 1983 and also Title VII because other courts (one within
   this circuit and others outside) have held that Section 1983 claims
25 could not be pursued on the same discriminatory and retaliatory acts.
   <u>Friday v. City of Portland</u>, 2005 WL 189717, at *6 (D. Or.
26 2005)(internal citations omitted).  However, Defendants overlook the
   fact that these cases dealt with whether Section 1983 relief could be
27 claimed on account of violation of the Equal Protection Clause and not
   the First Amendment.

28                                    14

engaged in expressive conduct that addressed a matter of public concern or was unrelated to her employment; (2) the government officials took an adverse action against her; and (3) her expressive conduct was a substantial motivating factor for the adverse action.  <u>Alpha Energy Savers, Inc. v. Hansen</u>, 381 F.3d 917, 923 (9th Cir. 2004)(citing <u>Roe v. City of San Diego</u>, 356 F.3d 1108, 1112 (9th Cir. 2004)).

Here, we find that Plaintiff's investigatory report was not a matter of public concern as it was confidential and only handed to the President and General Counsel and, as a matter that she was instructed to pursue, it was not a matter unrelated to her employment.[4]  Plaintiff's speech was private and kept between her

--------

[4]The Ninth Circuit has held that while sexual harassment in general is a matter of public concern, personal employment disputes do not attain the status of public concern simply "because [its] subject matter could, in different circumstances, have been the topic of a communication to the public that might be of general interest." <u>Connick v. Myers</u>, 461 U.S. 138, 148 n.8 (1983).  <u>Yatvin v. Madison Metro Sch. Dist.</u>, 840 F.2d 412, 419-20 (7th Cir. 1988)(in general "sex discrimination is a matter of public concern." but a particular sex discrimination claim was not a matter of public concern in "absence of any attempt to distinguish the case from the run-of-the-mine single-plaintiff discrimination case.");  <u>Doherty v. Portland Community College</u>, 2000 U.S. Dist. LEXIS 17595, at *17-18 (D. Or. 2000)(First Amendment does not protect every complaint of discrimination by an employee about the workplace of a public employer."); <u>Fischer v. City of Portland</u>, 2003 U.S. Dist. LEXIS 25613, at *15 ("Plaintiff's complaints to management about alleged sexual harassment and a hostile work environment are insufficient in and of themselves to constitute protected speech for purposes of the First Amendment.").  While Plaintiff would have been allowed to make general statements about sexual harassment and the sexual harassment policies and practices of the University to the public without interference from Defendants, details of the personal complaints that were filed against the University are not a matter of public concern.  <u>Bennett v. Washington County</u>, 2000 U.S. App. LEXIS 5229, at *3 (9th Cir. 2000)("Because [plaintiff's complaint] merely addresses her personal grievance with [defendant] and not County harassment policies in general, it is not protected speech.").  In addition, Plaintiff's report was confidential and to be distributed to only select members

employer and her and was not disclosed to any outside parties.
Because Plaintiff's speech falls into neither of the categories
which are protected by the First Amendment, summary judgment for
the Defendant will be granted as to Plaintiff's First Amendment
claims.

**D.   Defamation**

        Plaintiff's final claim is for defamation.[5]

        With respect to Plaintiff's constitutional defamation claim,
the Supreme Court has held that "injury to reputation alone is not
sufficient to establish a deprivation of a liberty interest
protected by the Constitution." Ulrich v. City & County of San
Francisco, 308 F.3d 968, 982 (9th Cir. 2002)(citing Paul v. Davis,
424 U.S. 693, 701, 711 (1976)).   The stigma-plus test announced by
the Supreme Court in Paul requires that Plaintiff show the public
disclosure of a stigmatizing statement by the government, the
accuracy of which is contested, *plus* the denial of "some more
tangible interest[] such as employment" or the alteration of a
right or status recognized in state law.   Paul, 424 U.S. at 701,
711.

        Here, Plaintiff has failed to prove that there was "public
disclosure" of the claims associated with her discharge.   As the
Ninth Circuit held in Wenger v. Monroe, disclosures made to other

of the University.   This further emphasizes the non-public nature of
her speech.

        [5]Plaintiff provides two bases for her defamation claim: "stigma
plus" defamation and defamation under Nevada state law.   We will
consider each in turn.

branches of the employer and not to the public are not "public disclosure."  282 F.3d 1068, 1075 (9th Cir. 2002).  Here, Plaintiff has not proved that false statements were made to the public and can only prove that notice of her nonreappointment was made to the President's Cabinet.  Therefore, Plaintiff's claim of "stigma plus" defamation by Defendants must be dismissed and Defendants' motion for summary judgement on Plaintiff's claim for stigma plus defamation will be granted.

The Ninth Circuit has held that absent an allegation of "stigma plus", Plaintiff's only remedy is state defamation.

Under Nevada state law, a defamation claim requires demonstrating "(1) a false and defamatory statement of fact by the defendant concerning the plaintiff; (2) an unprivileged publication to a third person; (3) fault, amounting to at least negligence; and (4) actual or presumed damages."  Pope v. Motel 6, 114 P.3d 277, 282 (2005).

Plaintiff claims that Defendants made defamatory statements when it began termination proceedings against her including references to fraud, theft, and misuse of accrued leave.

Plaintiff has failed to prove how such statements were false.  Defendants have proved (as will be discussed later) that Plaintiff committed fraud on the University, was unjustly paid for seven months and breached her contract with the University by taking leave when she had used up all the annual leave she had left.  Defendants terminated her for these reasons.  Plaintiff later admitted to Dr. Laden that she considered her employment with the

17

University terminated.  Therefore, Defendants' motion for summary judgment as to defamation under Nevada state law will be granted.

**E.  Counterclaim: Breach of Contract**

Plaintiff Dougherty has moved for summary judgment on Defendants' counterclaim for breach of contract stating that there is no issue of material fact.  Defendants have moved for cross summary judgment on the same claims.  We are persuaded that there is no issue of material fact as to whether Plaintiff committed breach of contract, fraud and unjust enrichment and therefore rule in favor of Defendants on their motion for summary judgment.

Plaintiff Dougherty first argues that there can be no breach of contract because she failed to sign the contract for the 2002-2003 term because the President had not signed the contract and all contracts unsigned by the President are treated as instruments of negotiations under the UCCSN Code.[6]

Section 5.3 of the UCCSN Code does provide that "No employment contract is valid without the president's signature and a contract form which has not been signed by the president is considered an instrument of negotiation and is not a binding contract or offer." However, the contract for the term 2002-2003 which is the subject of the breach of contract claim was signed by President Lilley.[7]

---

[6]We note that Plaintiff does not cite the actual Code section which justifies this proposition but merely relies on her own deposition for this allegation.

[7]Indeed, above the President's signature is the following phrase: "Accepted on behalf of the University and Community College System of Nevada thereby making this document a contract."

18

The 2002-2003 contract was sent to Plaintiff with the following statement: "Because you have not signed the Terms of Employment document, [Vice Provost Ort has] submitted the document directly to Personnel.  The attached Terms of Employment document for 2002-2003 is in effect."

Under contract law, the validity of a contract is not dependent upon signature of the parties unless signatures are made condition to the agreement, although some form of assent to the terms of the contract is necessary and may be expressed by acts manifesting acceptance.  <u>International Creative Management, Inc. v. D&R Ent't Co.Inc.</u>, 670 N.E. 2d 1305, 1312 (Ind. 1996).  Indeed, "if the offeror does not prescribe any specific form of acceptance [to an offer], acceptance may be inferred from acts of the offeree as well as from his or her words."  17A Am. Jur. 2d *Contracts* § 96. Here, Plaintiff did not object to the memo sent to her by Vice Provost Ort and Plaintiff accepted payroll payments deposited into her account beginning in 2002.  Such acceptance of payment can be deemed assent to the terms of the contract given to her.  In addition, in her deposition, Plaintiff claimed that the contract of 2002-2003 was "a valid contract."

Plaintiff then argues that she was on leave during the time that she was supposed to return to work and that she would have reported to work once she was provided a job description.

Plaintiff was provided a job description with the reasons for Notice of Non-Reappointment delivered to her on July 26, 2002.  Her duties were clearly outlined and she was told to report to Vice Provost Ort for a further description of her duties.  Despite

having had notice of her duties in this letter written by President
Lilley, Plaintiff claims that she would only return to work once
given a job description.  In effect, Plaintiff claims that a
description of her job duties was a condition precedent to her
performance of returning to work.  <u>Williston on Contracts</u>, §43.15
("Where there has been a material failure of performance by one
party to a contract, so that a condition precedent to the duty of
the other party's performance has not occurred, the latter party
has the choice to continue to perform under the contract or cease
to perform, and conduct indicating an intention to continue the
contract in effect will constitute a conclusive election, in effect
waiving the right to assert that the breach discharged any
obligation to perform.")

On the issue of whether the failure to give a description of
the job would have excused Plaintiff's performance, we find that
Plaintiff's performance was not excused.

First, Plaintiff was given a copy of her job description on
July 26, 2002.  Second, failure to give a job description is not a
material failure of performance–Plaintiff could have gotten
information about the job by showing up to work for Vice Provost
Ort.  Third, Plaintiff continued to accept payroll checks in her
bank account during that time showing that the contract had
continued and thus waived a right to claim breach or failure to
perform.

Whether Plaintiff was on leave and this excused her showing up
to her job is also an unavailing argument with respect to whether
Plaintiff breached the contract.  Plaintiff had exhausted her leave

on March 14, 2003, and was asked to return to work or provide the University with her status.  Despite these requests, Plaintiff remained out of the office and did not report to work.  Reporting to work on May 12, 2003, for one meeting does not excuse the fact that Plaintiff had not reported to work in the months before and would not return to work in the months after.

Plaintiff's contract required that she work full-time for the University.  Plaintiff breached this contract by not reporting to work after her annual leave was exhausted.  Therefore, Defendants' motion for summary judgement as to the counterclaim for breach of contract will be granted.

**F.  Counterclaim: Breach of Implied Contract**

Plaintiff claims that because she did not sign her employment contract there was no contract for the term of 2003-2004 (employment beginning July 1, 2003-June 30, 2004) and therefore that she would not be liable for breach of implied contract for this time period.

However, as stated above, a contract may be valid without a party's signature if the contract does not require signature as condition precedent and if the party assents in a different manner to the contract.  <u>International Creative Management</u>, 670 N.E. 2d at 1312.  Here, Plaintiff's acceptance of payroll checks into her bank account can be seen as assent to the terms of the contract and thus creates an implied contract with the terms sent to her by the University.

As above, we find that Plaintiff breached this contract by refusing to show up to work and by continuing to insist that she was on valid annual leave time while she was employed with another university in another state.

## G.  Counterclaim: Intentional Misrepresentation

Plaintiff claims that she cannot be held liable for intentional misrepresentation because she was never asked by the University if she was working elsewhere.  She claims that she was under no exclusivity agreement and, thus, there was no obligation to disclose such secondary employment.  She claims that on July 30th, 2003, she considered herself terminated and up until that time had been using leave time to perform her second job in Washington.

Under Nevada law, which Plaintiff makes no citation to, in order to allege a claim of misrepresentation, the pleading party must show: (1) a false representation made by Plaintiff; (2) Plaintiff's knowledge or belief that the representation was false or that Plaintiff has an insufficient basis of information for making the representation; (3) Plaintiff intended to induce Defendants to act or refrain from acting upon the misrepresentation; and (4) damage to the Defendants as a result of relying on the misrepresentation.  Barmettler v. Reno Air, Inc., 114 Nev. 441, 447, 956 P.2d 1382 (1998)(citing Bulbman, Inc. v. Nevada Bell, 108 Nev. 105, 110-11, 825 P.2d 588, 592 (1992); Lubbe v. Barba, 91 Nev. 596, 599, 540 P.2d 115, 117 (1975)).

Here, there exists no issue of material fact as to whether Plaintiff intentionally misrepresented her employment status to the

22

University and Defendant's counter-motion for summary judgment will be granted.

As to the first and second element, Plaintiff accepted the job with Washington State University in December 2002.  Subsequent to this time, Plaintiff failed to respond to requests by the University that she update it on her employment status given that she had been absent from the University since January 2003. Plaintiff's insistence that she be given leave time while she performed another job in another state was a misrepresentation to the University.  When told that she had not justified her leave time, Plaintiff asked the University to consult her physician's letter which would justify her absence from work.  The physician's letter did not justify this absence.  Plaintiff's continued insistence that she was justified in taking leave time while she knew that she was performing another job full-time in another state constitutes a false representation.

In addition, in her May 12, 2003 meeting with Vice Provost Ort, Plaintiff's response to how her job search was going was that she had "looked into" a couple of things.  This was a false representation – Plaintiff had obtained employment elsewhere at another university at the time she made the statement.

Plaintiff's claim that she was not under an exclusive contract with the University is unavailing.  She was still under a duty to show up to work every day regardless of whether she held employment elsewhere.

23

As to the third element, there is sufficient evidence that Plaintiff made these representations in order to get the University to delay termination procedures against her.

As a result of her misrepresentations, the University continued to pay Plaintiff and attempted to work with Plaintiff allowing her time to provide the correct leave paperwork from her doctor.  Thus, Defendants incurred damages as a result of Plaintiff's behavior.

Thus, Defendant's counter-motion for summary judgment will be granted.

## H.  Counterclaim: Concealment

Under Nevada law, the elements of fraudulent concealment are: (1) Plaintiff must have concealed or suppressed a material fact; (2) Plaintiff was under a duty to disclose the fact to Defendants; (3) Plaintiff must have intentionally concealed or suppressed the fact with intent to defraud the Defendants, that is, she must have suppressed the fact for the purpose of inducing the Defendants to act differently than they would if they knew the fact; (4) Defendants must have been unaware of the fact and would not have acted as they did if they had known of the suppressed fact; and (5) as a result of the suppression of the fact, the Defendants must have sustained damages.  <u>Nevada Power Co. V. Monsanto Co.</u>, 891 F. Supp. 1406, 1415 (1996).

Here, Defendants have proved the first element of the counterclaim: that Plaintiff suppressed the material fact of her employment with Washington State University.  With knowledge of

this fact, Defendants would not have continued to try and accommodate Plaintiff and would have immediately commenced termination procedures and stopped paying her through direct deposit.

However, Defendants have failed to prove that Plaintiff was under a duty to disclose this information.  It has been held that "[a]bsent such a [special] relationship, no duty to disclose arises, and as a result, no liability for fraudulent concealment attaches to the nondisclosing party." Dow Chem. Co. V. Mahlum, 114 Nev. 1468, 1487 (1998)(reversed on other grounds).  A special relationship that gives rise to a duty to disclose might arise when one party reasonably imparts special confidence in the other party and the other party has a reason to know of this confidence. Mackintosh v. Jack Matthews & Co., 109 Nev. 628, 634-35 (1993). Superior knowledge imposes a duty to speak in certain transactions in order to put both parties on equal footing.  Id.  The duty to speak does not necessarily depend on the existence of a fiduciary relationship although a fiduciary duty does gives rise to a duty to disclose.  Foley v. Morse & Mowbray, 109 Nev. 116, 125-26 (1993).[8]

Here in the absence of a special relationship under the law of Nevada, we find that summary judgment should be granted on

---

[8]Although we note that under Nevada law, an employee has a duty of loyalty to her employer, this duty of loyalty extends to situations of competing with the interests of the employer to the detriment of the employer's business.  White Cap Indus., Inc. v. Ruppert, 67 P.3d 318, 319-20 (2003).  Since there is no such charge here of competing with business interests on the part of Plaintiff, the basis for a "special relationship" which could give rise to a duty to disclose is not apparent and therefore we find that a "duty to disclose" did not exist on this basis.

Defendants' counterclaim for concealment. Plaintiff's motion for summary judgment on Defendants' counterclaim for concealment will be granted.

## I. Unjust Enrichment

Under Nevada state law, "unjust enrichment occurs whenever a person has and retains a benefit which in equity and good conscience belongs to another." <u>Mainor v. Nault</u>, 101 P.3d 308, 317 (2004)(citing <u>Coury v. Robinson</u>, 115 Nev. 84, 90, 976 P.2d 518 (1999)(internal citations omitted)). Unjust enrichment is the unjust retention of a benefit to the loss of another. <u>Nevada Industrial Dev. V. Benedetti</u>, 103 Nev. 360, 363 n.2, 741 P.2d 802, 804 n.2 (1987).

Here, allowing Plaintiff to keep the salary that she had received through defrauding Defendants as to her employment status would result in unjust enrichment since Plaintiff would unjustly retain salary that she did not work for.  Therefore, Defendants' motion for summary judgment as to unjust enrichment will be granted.

**IT IS HEREBY ORDERED** that Plaintiff's Motion (#48) for Summary Judgment on Defendants' Counterclaims is **DENIED**, except as to Defendants' counterclaim for concealment for which summary judgment is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (#54) on Defendants' Counterclaims is **GRANTED** as to the claims for breach of contract, breach of implied contract, intentional

misrepresentation, and unjust enrichment and is **DENIED** as to the claim for concealment.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (#54) is **GRANTED** as to Plaintiff's claims for First Amendment retaliation and federal and state claims for defamation.

**IT IS FURTHER ORDERED** that Defendants' Motion for Summary Judgment (#54) on Plaintiff's Title VII Retaliation claim is **DENIED.**

This 22nd day of December, 2005.

Edward C. Reed.

UNITED STATES DISTRICT JUDGE

27