1

2

3

4

5                         **UNITED STATES DISTRICT COURT**
                               **DISTRICT OF NEVADA**
6                                **RENO, NEVADA**

7
    MARY LAHREN, an individual;   )        3:03-CV-0631-ECR-VPC
8   RICHARD SCHWEICKERT, an       )
    individual; ANN DOUGHERTY,    )
9   an individual;               )
                                  )
10                                )        **ORDER**
    Plaintiffs,                   )
11                                )
    vs.                           )
12                                )
    UNIVERSITY AND COMMUNITY      )
13  COLLEGE SYSTEM OF NEVADA, a   )
    political subdivision of      )
14  the State of Nevada;          )
    ROBERT KARLIN, an individual; )
15  JOHN LILLEY, an individual;   )
    JANE LONG, an individual;     )
16  JOHN FREDERICK,               )
    an individual; JAMES          )
17  TARANIK, an individual        )
                                  )
18  Defendant.                    )
    _____)
19

20

21  **I.  Procedural Background**

22      On August 30, 2004, Plaintiff Mary Lahren ("Plaintiff" or

23  "Lahren") filed a Second Amended Complaint (#43) against Defendants

24  University and Community System of Nevada, Robert Karlin, John

25  Lilley, Jane Long, John Frederick, and James Taranik ("Defendant",

26  "Defendants", "UCCSN", "Karlin", "Lilley", "Long", "Frederick" and

27  "Taranik") alleging claims of sex discrimination and retaliation,

28  an invalid release, and interference with prospective contractual

relations and economic advantage.  On May 3, 2005, Defendants filed a Motion for Summary Judgment (#50) as to the Claims Alleged by Plaintiff Lahren. On August 28, 2005, Plaintiff responded to the motion (#75) and Defendant filed a reply (#85) on August 30, 2005. The motion (#50) is ripe, and we now rule on it.

**II.   Statement of Facts**

Plaintiff Mary Lahren received her B.S. degree in Geology in 1983 and a Ph.D. in Geology in 1989 from the University of Nevada, Reno ("the University").  Upon the completion of her degree, she was employed by the University in its Department of Geological Sciences as a Faculty Research Associate from 1989 to 1992, a Research Assistant Professor from 1992 to 1995, and a Research Associate Professor from 1995 until her termination pursuant to the Settlement Agreement on July 30, 2002.  On July 1, 2001, Plaintiff reduced her hours from full time to part time due to a work disability.

In November 2001, Plaintiff was told by Dr. Robert Karlin, the head of the Geology Department, that there would be no money available to pay her to teach a class in Spring 2002 and Dr. Karlin did not assign Plaintiff any classes to teach during that semester. After that time, Plaintiff had a very hard time getting funding for her projects.  The National Science Foundation ("NSF") turned down a proposal submitted by her and Dr. Richard Schweickert.

On December 24, 2001, Plaintiff received a memorandum from Mary Ann Keith, who was the Personnel Coordinator for the Department of Geological Services, stating that since Plaintiff

2

1  would not be teaching in the fall, and her grant funding had ended,

2  her funding from the Department would end on January 31, 2002.

3      On December 26, 2001, Plaintiff met with the University's

4  Human Resources Department regarding her application for long-term

5  disability benefits.  She claimed that she could only complete very

6  few of her previous job duties but would be able to teach as long

7  as it was for less than an hour and would be able to publish on

8  material for which she did not have to do her own field research.

9      On January 2, 2002, Plaintiff's physician informed Human

10 Resources that she would not be able to return to her previous

11 work.  On January 15, 2002, UCCSN Human Resources informed its

12 insurance carrier that Plaintiff would need temporary disability

13 benefits effective February 1, 2002.

14     At this time, Plaintiff also received Notice of Non-

15 Reappointment.  On January 24, 2002, Plaintiff and co-Plaintiff Dr.

16 Schweickert met with Dr. Karlin to discuss teaching assignments.

17 According to Plaintiff, Dr. Karlin explained to the two of them

18 that Pat Cashman, another female professor, was going to teach

19 Geology 100 in the spring since Plaintiff taught the spring

20 before.[1]  Plaintiff became irate with Dr. Karlin and insisted that

21 she be given a course to teach.  Dr. Karlin suggested that he would

---

[1]Plaintiff relies on her own conclusory statement in her
declaration that accompanies her opposition to the motion for summary
judgment for the contention that she was the only person qualified to
teach this open course. Conclusory statements and those not based on
personal knowledge are to be disregarded in a motion for summary
judgment.  Coca-Cola Co. v Overland, 692 F.2d 1250, 1255 (9th Cir.
1982); Delange v. Dutra Const. Co., Inc., 183 F.3d 916, 921 (9th Cir.
1999).  Here, Plaintiff's statement is conclusory, and not based on
her personal knowledge of Pat Cashman's qualifications in comparison
to her own.

1  find her a one-credit course to teach.  Plaintiff rebuffed this
2  suggestion.

3      After this time, Plaintiff met with Jane Long to complain
4  about the preferential treatment of Pat Cashman.  She made no
5  mention of sexual harassment.

6      On January 30, 2002, Plaintiff received a memorandum from Jane
7  Long that Plaintiff would be on the payroll leave status until the
8  end of February 2002 but would have her employment terminated on
9  February 28, 2002.[2]  Plaintiff then met with Long to discuss other
10 employment opportunities in the University in February 2002.

11     In March 2002, Plaintiff was funded in part from a grant and
12 in part from discretionary funds controlled by Dr. Schweikert.
13 Thereafter, Plaintiff did obtain the grant of $25,000.00 and her
14 employment contract was extended through June 30, 2002.

15     On February 27, 2002, Plaintiff Lahren filed a Charge of
16 Discrimination with the EEOC and, on February 28, 2002, she filed a
17 complaint with the University's Affirmative Action Office.  In her
18 complaints, Plaintiff alleged that she had been sexually harassed
19 by the Department of Geological Sciences Chairman, Dr. Karlin,
20 dating back to 1999 and as a result of her rebuffing his advances,
21 he had retaliated against her by not assigning her open classes.

22     The Charge of Discrimination filed with the EEOC was mediated
23 and agreements were reached on April 19, 2002 and May 14, 2002.
24 The agreement that was reached on April 19, 2002, was modified by

25

26
_____

27     [2]Under  UCCSN  Code  which  governed  Plaintiff's  contract,
Plaintiff's employment was terminable with 30 days notice.

28                                    4

agreement of the parties and a final Settlement Agreement was finally reached on May 14, 2002.

The Settlement Agreement was reached during the second mediation session conducted on May 14, 2002, and became effective on June 6, 2002.  At the time, Plaintiff was given between May 14 and June 6 to think over the agreement and to decide whether it would become binding.[3]  The Settlement Agreement included two documents: an EEOC form agreement with boilerplate terms and a Settlement of All Claims drawn up by the University.  The Settlement of All Claims included the following provisions:

> 1.  In exchange for satisfactory fulfillment by Respondent of the promises by Respondent officials in this agreement, Charging Party agrees not to institute a lawsuit under Title VII of the Civil Rights Act as amended...

> 6.  The parties agree that this Agreement may be specifically enforced in court and may be used as evidence in a subsequent proceeding in which any of the parties allege a breach of this Agreement...

Pursuant to the final Settlement Agreement, Plaintiff Lahren received $60,000 in damages including attorney's fees, and agreed to remain off campus until July 31, 2002.

In the final agreement, Plaintiff agreed that she would not institute further actions against Defendant UCCSN for any claims

---

[3]Plaintiff claims that the mediation resulted in an involuntary agreement because she was badgered, threatened, intimidated and told that she would be terminated in any case regardless of whether she signed the agreement or not.  Plaintiff claims that she was deprived of food and sleep and was not thinking clearly.  However, Plaintiff's tales of involuntariness fail to prove the agreement was involuntary as she had 23 days to think the agreement over.  During those 23 days, Plaintiff had several meeting with her attorney that did not result in her changing her mind.  Plaintiff failed to revoke her agreement during those 23 days and was therefore bound by the terms of the settlement.

5

arising out of her employment with UCCSN.  The agreement became final on June 6, 2002.

In December 2002, Plaintiff engaged a concern known as Documented Reference Check to investigate to determine whether Dr. Karlin was "blackballing" her.  Documented Reference Check finally made contact with Dr. Karlin on January 15, 2003, after repeated attempts to reach him and recorded a conversation in which Dr. Karlin attempted to evade questions about Plaintiff Lahren and, when asked about her, told the caller to call the Legal Department and also said you can contact the Affirmative Action Department. Plaintiff had engaged the services of Documented Reference Check because she believed that her application to Truckee Community College was thwarted by Dr. Karlin because she did not receive a call-back for an interview from the College.[4]  Dr. Karlin was not a party to the Settlement Agreement.

Plaintiff also alleges that after the Settlement Agreement was signed, Dr. Karlin retaliated against her by telling other faculty members that she had been dismissed for "double dipping."  She claims that as a result of Dr. Karlin's blackballing her and spreading rumors about her status at the University, he interfered with her prospective contractual relations.

_____

[4]Plaintiff uses her own declaration to establish that the person who was hired for the position at Truckee Community College was not qualified for the position.  Self-serving statements not based in any factual evidence will be disregarded in a motion for summary judgement.  Plaintiff has failed to show that actual statements were made and relies on a very strong inference based on no factual information to form the basis for this claim.

1   Plaintiff also alleged that, after the Settlement Agreement
2   was signed, Dean James Taranik (who was appointed after the
3   Settlement Agreement was signed) retaliated against Plaintiff and
4   breached the Settlement Agreement by disclosing to graduate student
5   Bryan Law that (1) Plaintiff's case had been settled; (2) Dr.
6   Karlin had been wrongly accused; (3) that she had obtained her
7   employment in violation of University policy; (4) that she had a
8   long history of making complaints against employers for sexual
9   harassment; (5) that Dr. Karlin was the principal investigator on a
10  research project and (6) that she was unable to secure funding.

11  On December 18, 2003, more than a year after the agreement
12  became final, Plaintiff Lahren filed this action alleging, in part,
13  that her execution of the Settlement Agreement was not voluntary,
14  deliberate and informed.

15

16  **II.  Discussion**

17

    **A.  Summary Judgment Standard**
18
19  Summary judgment allows courts to avoid unnecessary
    trials where no material factual dispute exists.  <u>Northwest</u>
20
    <u>Motorcycle Ass'n v. U.S. Department of Agriculture</u>, 18 F.3d 1468,
21
    1471 (9th Cir. 1994).  The court must view the evidence and the
22
    inferences arising therefrom in the light most favorable to the
23
    nonmoving party, <u>Bagdadi v. Nazar</u>, 84 F.3d 1194, 1197 (9th Cir.
24
    1996), and should award summary judgment where no genuine issues of
25
    material fact remain in dispute and the moving party is entitled to
26
    judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Judgment as a
27

28

matter of law is appropriate where there is no legally sufficient evidentiary basis for a reasonable jury to find for the nonmoving party.  Fed. R. Civ. P. 50(a).  Where reasonable minds could differ on the material facts at issue, however, summary judgment should not be granted.  Warren v. City of Carlsbad, 58 F.3d 439, 441 (9th Cir. 1995), cert. denied, 116 S.Ct. 1261 (1996).

The moving party bears the burden of informing the court of the basis for its motion, together with evidence demonstrating the absence of any genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the moving party has met its burden, the party opposing the motion may not rest upon mere allegations or denials in the pleadings, but must set forth specific facts showing that there exists a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Although the parties may submit evidence in an inadmissible form-- namely, depositions, admissions, interrogatory answers, and affidavits--only evidence which might be admissible at trial may be considered by a trial court in ruling on a motion for summary judgment.  Fed. R. Civ. P. 56(c); Beyene v. Coleman Security Services, Inc., 854 F.2d 1179, 1181 (9th Cir. 1988).

In deciding whether to grant summary judgment, a court must take three necessary steps: (1) it must determine whether a fact is material; (2) it must determine whether there exists a genuine issue for the trier of fact, as determined by the documents submitted to the court; and (3) it must consider that evidence in light of the appropriate standard of proof.  Anderson, 477 U.S. at 248.  Summary Judgement is not proper if material factual issues

1  exist for trial.  <u>B.C. v. Plumas Unified Sch. Dist.</u>, 192 F.3d 1260,
2  1264 (9th Cir. 1999).  "As to materiality, only disputes over facts
3  that might affect the outcome of the suit under the governing law
4  will properly preclude the entry of summary judgment." <u>Anderson</u>,
5  477 U.S. at 248.  Disputes over irrelevant or unnecessary facts
6  should not be considered.  <u>Id.</u>  Where there is a complete failure
7  of proof on an essential element of the nonmoving party's case, all
8  other facts become immaterial, and the moving party is entitled to
9  judgment as a matter of law.  <u>Celotex</u>, 477 U.S. at 323.  Summary
10 judgment is not a disfavored procedural shortcut, but rather an
11 integral part of the federal rules as a whole.  <u>Id.</u>
12
13 **B.  Retaliation**
14      Plaintiff's first claim is that Defendants retaliated against
15 her for filing a claim with the EEOC after the Settlement Agreement
16 was signed on May 14, 2002.  This retaliation claim is based on six
17 actions by the Defendants: (1) within six months of the Settlement
18 Agreement, Dr. Karlin told other faculty members that Plaintiff had
19 been "double-dipping"; (2) on January 15, 2003, Dr. Karlin referred
20 an employee of Documented Reference Check to the Legal Department
21 or the Affirmative Action Department when the investigator asked
22 about Plaintiff; (3) Plaintiff applied for employment elsewhere and
23 was denied; (4) Dean Taranik disclosed to Bryan Law that
24 Plaintiff's case had been settled and that things had sorted out
25 and everyone was happy (5) Dean Taranik told Law that Dr. Karlin
26 was wrongly accused of sexual harassment; (6) Dean Taranik told Law
27 that Plaintiff had secured work in violation of University policy
28                                    9

prohibiting post-doctoral work by students; (7) Dean Taranik told Law that Plaintiff delayed her sexual harassment claim filing; (8) Dean Taranik told Law that Dr. Karlin was the principal investigator on a research project and was primarily responsible for obtaining funding; and (9) Dean Taranik told Law that Plaintiff was not able to bring in necessary funding.

In order to establish a claim for retaliation under Title VII, Plaintiff must show: (1) prior engagement in a protected activity; (2) a subsequent adverse employment action; and (3) a causal link between the two. Moss v. England, 2005 U.S. App. LEXIS 10872, at *5 (9th Cir. 2005).

Since Plaintiff has demonstrated her prior engagement in a protected activity which resulted in a mediated settlement, our focus should be on whether Defendants' actions constituted adverse employment actions and whether there is a causal connection between the protected activity and Defendants' actions.

## 1.  Double-Dipping

Plaintiff claims that Dr. Karlin told other faculty members that Plaintiff had been dismissed for "double dipping." Plaintiff's evidence comes from a memorandum prepared by Dr. James Carr in which he wrote that Dr. Watters had told him Dr. Karlin had said Plaintiff was dismissed for "double dipping."

A motion for summary judgment can only be based on evidence which can be presented at trial. Here, this evidence is hearsay and will not be considered in deciding a motion for summary judgment. See Fed. R. Ev. § 801. This statement is double

10

1  hearsay: Dr. Karlin to Dr. Watters, Dr. Watters to Dr. Carr, and
2  Dr. Carr's memorandum.   Dr. Carr's memorandum is not a record made
3  in the course of regularly conducted business activity (803(6),
4  does not express his then existing state of mind (803(3), and
5  Plaintiff has not demonstrated that the witness would not remember
6  the statement if called to testify and therefore the statement is
7  not a recorded recollection. (803(5).

8      Dr. Watters testified that he never heard Dr. Karlin use the
9  term "double dipping."  Therefore, Plaintiff's claim as to this
10 evidence will not be considered in evaluating whether Defendants
11 retaliated against Plaintiff.

12

13 **2.  Documented Reference Check**

14     The question the Documented Reference Check call presents is
15 whether referring the caller to the Legal Department or Affirmative
16 Action Department did indeed constitute "adverse employment
17 action."

18     The Ninth Circuit has held that giving a negative performance
19 evaluation to a prospective employer can constitute adverse
20 employment action.  Brooks v. City of San Mateo, 229 F.3d 917, 928-
21 29 (9th Cir. 2000).  The court in Brooks recognized that there is a
22 fine line drawn between paralyzing employer action and reprimanding
23 employers for taking adverse action against complaining employees.
24 In defining what that line was, the court held:

25         "Among those employment decisions that constitute
           adverse employment action are termination, dissemination
26         of a negative employment reference, issuance of an
           undeserved negative performance review and refusal to
27         consider for promotion.  By contrast, we have held that

28                                     11

1   declining to hold a job open for an employee and
    badmouthing an employee outside the job reference
2   context do not constitute adverse employment actions."

3   Brooks, 229 F.3d 928-29 (internal citations omitted).

4       Whether referring a prospective employer to the Legal

5   Department or the Affirmative Action Department constitutes a

6   negative employment reference along the lines of an "adverse

7   employment action" is an issue of material fact that cannot be

8   resolved as a matter of law.  While Plaintiff Lahren's evidence is

9   by no means very strong, it is sufficient to survive summary

10  judgment on this issue.

11

12  **3.   Plaintiff Lahren's Search for Employment**

13      Plaintiff's claim that she has been unable to obtain

14  employment and that this has been caused by the University is based

15  on conclusory allegations and on facts not within her personal

16  knowledge.  Therefore, these claims are not based on Plaintiff's

17  personal knowledge that Defendants caused her not to gain

18  employment with prospective employers.  She has simply relied on

19  coincidences to justify her claim.

20

21  **4.   Dean Taranik's Statements**

22      Dean Taranik's statements were made to a graduate student of

23  the University's Geology Department—not to an outside employer

24  seeking to employ Plaintiff.  Because the Ninth Circuit in Brooks

25  held that bad-mouthing outside the job reference context does *not*

26  constitute adverse employment action, here, Dean Taranik's

27  statements cannot be considered adverse employment action. Dean

28                                  12

Taranik made the statements to a student and not to a prospective employer.  Bryan Law was not in a position to employ Plaintiff and his being told details of the settlement and of Plaintiff's employment was highly unlikely to have an impact on her future employment.

However, there remains an issue of material fact as to whether Dr. Karlin's referring the Documented Reference Check to the Affirmative Action office or the Legal Department constitutes adverse employment action.

The Ninth Circuit has held that a causal connection can be established by temporal proximity.  <u>Yartzoff v. Thomas</u>, 809 F.2d 1371, 1376 (9th Cir. 1987)("Causation sufficient to establish the third element of a prima facie case may be inferred from circumstantial evidence, such as the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision.").  Here, Plaintiff has shown that there was but six months between the time when the mediation settlement took place and the time of Dr. Karlin's allegedly adverse employment actions against her.

After Plaintiff establishes a prima facie case of retaliation, the burden of production then shifts to Defendants to articulate a legitimate, non-retaliatory explanation for the adverse action.  <u>Yartzoff</u>, 809 F.2d at 1377 (internal citations omitted).  Here, Defendants have offered no legitimate non-discriminatory reasons for Dr. Karlin's actions.  They have admitted that Dr. Karlin was "blind-sided" by the call and that Dr. Karlin should have referred

13

1   the caller to the Personnel Department.  For these reasons,

2   Plaintiff's claim of retaliation survives this motion for summary

3   judgment and Defendants' motion for summary judgment as to

4   retaliation will be denied.

5

6   **C.    Motion for Summary Judgment as to Dr. Karlin's Actions between**

7         **1999-2002**

8         Defendants have also moved for summary judgement on the claims

9   based on the sexual harassment that was the subject of the EEOC

10  mediation and Settlement Agreement in 2002.  Defendants claim that

11  since Plaintiff waived all claims she may have had up to the

12  effective date of the Settlement Agreement (June 6, 2002) she

13  should be barred from raising those claims here again.[5]

14        We agree that if the release is valid, Plaintiff's claims as

15  to actions between 1999-2002 would be barred as waived under the

16  release.

17        Whether a release is *valid* and indeed does release all claims

18  under Title VII, 42 U.S.C. §2000e is governed by federal law.

19  <u>Salmeron v. United States</u>, 724 F.2d 1357, 1361 (9th Cir. 1983).[6]

20  "Creation of a federal rule rather than absorption of a state rule

21

22        [5]Plaintiff claims that Defendant should not be able to raise the
    argument of validity of the release here in summary judgment.
23  Plaintiff's claims are without merit as (1) Plaintiff moved for
    invalidity of the release based on state law grounds in a prior motion
    and (2) claimed invalidity of the release in her complaint.
24

25        [6]We note that the claim of validity under Title VII is different
    from the inquiry of whether the release was void under state law.
26  Plaintiff's previous motion for summary judgment on validity of the
    release was based on the proposition that the release was void under
    state contract law and not whether the release was valid under Title
27  VII.

28                                    14

is appropriate where...the rights of the litigants and the operative legal policies derive from a federal source." Jones v. Taber, 648 F.2d 1201, 1203 (9th Cir. 1981).

The inquiry into the validity of the release under Title VII is two step.  First we must determine what claims Plaintiff waived under the release and second we must determine whether the release was "voluntary, deliberate, and informed." Stroman v. West Coast Grocery Co., 884 F.2d 458, 462 (9th Cir. 1989).

As to the first step of the inquiry, we find that Plaintiff surrendered all of her claims under Title VII as of the time the final Settlement Agreement became effective. ("Charging Party agrees not to institute a lawsuit under Title VII of the Civil Rights Act...").  Plaintiff was given $50,000 and $10,000 in attorney's fees for waiving her rights to sue for those Title VII claims and other claims arising out of her employment with Defendant.  Thus, we find that the release waived all of Plaintiff's rights under Title VII as they existed at that time.

As to the second step, we must examine the totality of the circumstances to determine whether the release was valid. Salmeron, 724 F.2d at 523.  Of primary importance to the Ninth Circuit is the clarity and lack of ambiguity of the agreement, the plaintiff's education and business experience, the presence of a non-coercive atmosphere for the execution of the release, and whether the employee had the benefit of legal counsel. Stroman, 884 F.2d at 462.

Here there is no issue of material fact as to whether the release was valid.

15

In this case, the agreement between the University and Plaintiff was clear and unambiguous.  If Plaintiff agreed to waive all her rights under Title VII for actions committed by the University and its employees up until that date, Plaintiff would receive $50,000 and $10,000 for her attorney.  No reasonable person could have been misled by the terms of the agreement.  Harry's Cocktail Lounge v. McMahon, 1996 U.S. App. LEXIS 30876, at *10 (9th Cir. 1996).

Plaintiff makes the claim that she was put under economic duress during negotiations to the point where she felt that she had no option but to agree to the terms of the settlement.  She provides several reasons for this claim: (1) the University's determination on her claim was misrepresented; (2) she was told that sexual harassment claims were hard to litigate; (3) she was informed that the April 19, 2002 settlement would go into effect if she did not sign the May 14, 2002 settlement agreement and (4) the University had already decided to terminate her and if she did not sign, she would be forced to work with Dr. Karlin.

To demonstrate a case of economic duress, Plaintiff must show wrongful acts or threats, financial distress caused by those acts, and absence of any reasonable alternative to terms presented by the wrongdoer.  Gruver v. Midas Intern. Corp., 925 F.2d 280, 282 (9th Cir. 1991).  Here, we find that there was no economic duress present and the coercive atmosphere complained of was mitigated by the fact that Plaintiff had 23 days to void the agreement.  Indeed, many of the actions of the University and mediator, we find, are not uncommon in many mediations, where mediators are attempting to

1   obtain a settlement and employ many tactics to try and get the
2   parties to come to an agreement.

3       First, although the University may have misled Plaintiff as to
4   its findings, Plaintiff admits that her lawyer during the
5   meditations informed her that her case was good and that she might
6   win some money from bringing a claim.  The University's
7   representations were their own determination on the claim and
8   cannot be said to have created an atmosphere of coercion given
9   Plaintiff's own estimations about her suit. The University's
10  findings, in addition, are their own determination and their own
11  opinions and would have little, if any, effect on later
12  determinations by the EEOC or a jury as to Plaintiff's claims.

13      Second, whether or not sexual harassment claims are hard to
14  litigate and whether EEOC letters for right to sue are difficult to
15  obtain has no bearing on Plaintiff's own decision as to whether or
16  not to pursue or settle her claim.  Expressions of opinion are
17  generally not actionable.  Vaefaga v. Oregon Steel Mills, 1995 U.S.
18  App. LEXIS 34930, at *6 (9th Cir. 1995).  In the first place,
19  Plaintiff had to weigh her decision to bring the claim against
20  these kinds of factors.  Given that she was advised by an
21  experienced attorney as to whether or not her claim had merit, we
22  find this evidence does not support a claim that an atmosphere of
23  coercion existed.

24      Third, Plaintiff admits in her deposition that she knew the
25  April 19, 2002, mediation settlement agreement was modified by the
26  May 14, 2002, final Settlement Agreement.  She cannot now claim in
27  her declaration that she did not understand whether the April 19,

28                                  17

2002, agreement would go into effect.  <u>Oliver v. Keller</u>, 289 F.3d 623, 629 (9th Cir. 2002)("Appellant cannot generate an issue of material fact by providing contradictory statements.").  In addition, she states that she did have the option to revoke and describes what would have happened in those circumstances.  Whether the April 19, 2002, settlement was going to go into effect was never cited as a real possibility that she considered when deciding whether or not to execute the May 14, 2002, agreement.

Last, whether Plaintiff would have to work with Dr. Karlin or not is a factor independent of the settlement.  If Plaintiff had decided to continue to work and pursue the claim through litigation, she would have been working with Dr. Karlin during that time.  She would have had remedies through retaliation claims under Title VII if he decided to "get back" at her for filing her complaint.  Therefore, the decision as to whether or not to sign the agreement did depend on her working with Dr. Karlin and was not a source of economic duress.

Whether or not the University decided to terminate her was not known to Plaintiff at the time she signed the agreement and was only known to her months after.  This fact therefore cannot serve as a basis of duress.

We find also the fact that Plaintiff had twenty-three days to think over whether or not to cancel the settlement further proves that there was an absence of coercion and duress.  During this time Plaintiff could have made further investigations and indeed had her attorney inquire into the further details of the agreement.

Plaintiff's claims that she was hypoglycemic do not support the invalidity of the release.  Plaintiff was given twenty three days to think over the settlement agreement and decide whether or not she should revoke it.  There is no claim that during this time she was ill.  Indeed, during this time, Plaintiff and her attorney were actively reviewing their options.  Plaintiff met with her attorney and her attorney sent questions to the University regarding the scope of the agreement.  This correspondence shows Plaintiff actively thinking over the agreement and whether the terms were acceptable to her.

The other factors weigh against Plaintiff-Plaintiff is highly educated and although not a legal professional, she is still a very intelligent professor with a Ph.D. and competent to understand the full nature of the events surrounding the mediation and agreement. In addition, Plaintiff was represented during the mediation by competent counsel.

For these reasons, we find that the agreement was valid and that Plaintiff cannot assert its invalidity in order to resurrect claims that she has waived by way of the Settlement Agreement.

**D.**   **Motion for Summary Judgment as to Dr. Karlin's Actions before December 18, 2001**

Defendant Karlin has moved for summary judgment for claims based on actions that took place before December 18, 2001, as those claims are barred by the statute of limitations.

Section 1983 which allows suits against state officials does not have an applicable statute of limitations.  The Supreme Court has held that in the absence of a statute of limitations, courts

should simply borrow the statute of limitations in the applicable state. <u>Wilson v. Garcia</u>, 471 U.S. 261, 276 (1985). Here, Nevada's statute of limitations is two years. <u>NRS 11.190(4)(e)</u>.

Because over two years had passed before Plaintiff filed this action, Plaintiff's 1983 action against Dr. Karlin for events transpiring before 2001 will be dismissed.

**E.   Motion for Summary Judgment by Dr. Karlin as to Dr. Karlin's Actions after May 14, 2002**

Defendant Karlin has also moved for summary judgment as to the retaliation claims alleging that they cannot be the subject of a section 1983 claim in this case.

A section 1983 case has two elements: (1) the conduct complained of must have been under the color of state law, and (2) the conduct must have subjected Plaintiff to deprivation of constitutional rights. <u>Ramirez v. Kroonen</u>, 44 Fed. Appx. 212, 215 (9th Cir. 2002).

Recently, the District of Oregon concluded that "even if the claims under Title VII were viable, the plaintiff 'probably could not have pursued section 1983 claims based on the same discriminatory and retaliatory acts." <u>Friday v. City of Portland</u>, 2005 WL 189717, at *2 (D. Or. 2005). Although other circuits have ruled on this issue and agreed with the District of Oregon, the Ninth Circuit has yet to address this issue.

Here, Plaintiff alleges that her right to equal protection was violated by Defendant Karlin. However, Plaintiff provides no evidence that her treatment by Dr. Karlin after May 14, 2002, was

due to her sex.  Because Plaintiff has provided no evidence that Dr. Karlin deprived her of a constitutional right, Defendants' motion for summary judgment as to Plaintiff's 1983 claims will be granted.

**F.   Intentional Interference with Prospective Contractual Relations**

Plaintiff also claims that Dr. Karlin interfered with an existing and prospective contractual relations because he told Document Reference Check that they should contact the Affirmative Action Department or Legal Department.

To establish the tort of interference with prospective business advantage, Plaintiff must establish: "(1) a prospective contractual relationship between the plaintiff and a third party; (2 the defendant's knowledge of this prospective contractual relationship; (3) the intent to harm the plaintiff by preventing the relationship; (4) the absence of privilege or justification by the defendant; and (5) actual harm to the plaintiff has a result of the defendant's conduct." <u>Consolidated Generator-Nevada v. Cummins Engine Company, Inc.</u>, 114 Nev. 1304, 1311 (1998).

As described above, Plaintiff's claim that Dr. Karlin interfered with her being hired by Truckee Community College is without merit.  Plaintiff presents her own opinions as to the candidates and can point to no evidence that Dr. Karlin was actually contacted by Truckee Community College or that Truckee Community College had intent to enter into a contract with her. She can only show that she applied to the College and that she believed that she was more qualified than the person that was

hired.   Such subjective beliefs are not the basis for the creation of an issue of material fact and Defendant's motion for summary judgment on interference with existing and prospective contractual relations will be granted.

**IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (#50) with respect to the claims of Plaintiff Lahren is **GRANTED** as to all claims except the claim for retaliation based on the alleged negative job reference.

This 22nd day of December, 2005.

*Edward C. Reed.*

UNITED STATES DISTRICT JUDGE